# United States Court of Appeals for the Federal Circuit

---

**SHENYANG YUANDA ALUMINUM INDUSTRY ENGINEERING CO., LTD., OVERGAARD LIMITED, JANGHO CURTAIN WALL AMERICAS CO. LTD.,** AND **YUANDA USA,**
*Plaintiffs-Appellants,*

AND

**BUCHER GLASS, INC.,**
*Plaintiff,*

v.

**UNITED STATES, WALTERS & WOLF, BAGATELOS ARCHITECTURAL GLASS SYSTEMS, INC.,** AND **ARCHITECTURAL GLASS & ALUMINUM COMPANY,**
*Defendants-Appellees.*

---

2014-1386, -1387, -1388

---

Appeals from the United States Court of International Trade in Nos. 1:12-cv-00420-RKE, 1:12-cv-00423-RKE, and 1:12-cv-00424-RKE, Judge Richard K. Eaton.

---

Decided:  January 21, 2015

---

THOMAS M. BELINE, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for plaintiffs-appellants. With him on the brief were JAMES R. CANNON, JR. and THOMAS M. BELINE. Of counsel on the brief were KRISTEN SMITH and MARK LUDWIKOWSKI, Sandler, Travis & Rosenberg, P.A., of Washington, DC.

TARA K. HOGAN, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. With her on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and REGINALD T. BLADES, JR., Assistant Director. Of counsel on the brief was SCOTT MCBRIDE, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, of Washington, DC.

DAVID M. SPOONER, Barnes & Thornburg LLP, of Washington, DC, argued for defendant-appellee Walters & Wolf. With him on the brief was CHRISTINE J. SOHAR HENTER.

_____

Before PROST, *Chief Judge,* PLAGER and WALLACH, *Circuit Judges.*

WALLACH*, Circuit Judge.*

Shenyang Yuanda Aluminum Industry Engineering Co., Ltd., Jangho Curtain Wall Americas, Co., Ltd. ("Jangho"), Overgaard Limited, and Bucher Glass, Inc. (collectively, "Yuanda") appeal the January 30, 2014, judgment of the United States Court of International Trade ("CIT") affirming the Department of Commerce's ("Commerce") determination that curtain wall units are within the scope of the antidumping and countervailing duty orders on aluminum extrusions from the People's Republic of China. Because the CIT's decision is support-

ed by substantial evidence and is in accordance with law, this court affirms.

BACKGROUND

The United States International Trade Commission ("ITC") initiated an investigation into whether a domestic industry was materially injured or threatened with material injury by reason of imports of certain aluminum extrusions from the People's Republic of China on March 31, 2010. *See* Certain Aluminum Extrusions from China, USITC Pub. 4153, Inv. Nos. 701-TA-475, 731-TA-1177, at 1 (June 2010) (Preliminary) ("ITC's Preliminary Determinations"). On May 26, 2011, Commerce issued antidumping and countervailing duty orders on aluminum extrusions from the People's Republic of China. *See Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011); *Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 30,653 (Dep't of Commerce May 26, 2011) (the "Orders").

In October 2012, Defendants-Appellees, Walters & Wolf, Bagatelos Architectural Glass Systems, Inc., and Architectural Glass & Aluminum Co., collectively referred to as the Curtain Wall Coalition (the "CWC companies"), submitted an amended scope request to Commerce pursuant to 19 C.F.R. § 351.225(c) (2012). The scope request asked Commerce to "issue a scope ruling confirming that curtain wall units and other parts of curtain wall systems are subject to the scope of the [Orders]." J.A. 4. In the scope request, the CWC companies explained that curtain walls are comprised of numerous curtain wall components, which can be categorized into three groups:

(i) an aluminum extruded frame, which includes anchors, overlays, and other devices that attach the unit to the cement structure and adjoining units; (ii) infill material; and (iii) hardware to at-

tach the curtain wall parts to the building, as well as to adjoining units, including fasteners, elastomeric lineal gaskets, anchor assemblies and components, clips, screws, nuts and bolts, steel embeds, splices to adjoin units, sealants used between the frames, infill material, and aluminum extrusion trim to physically attach the suspending curtain wall to the building structure.

Appellee's Br. 10 (citing J.A. 986–93).

Yuanda challenged the standing of the CWC companies, arguing that the CWC companies had not demonstrated they produced aluminum extrusions. Commerce found the CWC companies qualified as interested parties under § 771(9)(C) of the Tariff Act of 1930, as amended, "as manufacturers, producers, or wholesalers of a domestic like product, and thus ha[d] standing to bring the Amended Scope Request." *Final Scope Ruling on Curtain Wall Units and Other Parts of a Curtain Wall System from the PRC* (Dep't of Commerce, Nov. 30, 2012), ECF Dkt. No. 56-37 ("Final Scope Ruling") (J.A. 117–26); *see* 19 U.S.C. § 1677(9)(C) (2006).

After resolving standing, Commerce initiated a scope investigation of the Orders and determined Yuanda's curtain wall units were within the scope. Since it found the Order language dispositive, Commerce determined it was "unnecessary to consider" the secondary criteria set forth in 19 C.F.R. § 351.225(k)(2). Final Scope Ruling at 8. The CIT affirmed Commerce's determination and found Commerce correctly declined to consider the secondary (k)(2) factors. *Shenyang Yuanda Aluminum Indus. Eng'g Co., v. United States*, 961 F. Supp. 2d 1291 (Ct. Int'l Trade 2014); *see also* 19 C.F.R. § 351.225(k)(1), (2).

Yuanda timely appeals. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (2012).

### DISCUSSION

This court reviews Commerce's final determinations by reapplying the same standard used by the CIT; that is, the question is whether Commerce's determination is supported by substantial evidence and is otherwise in accordance with law. *Global Commodity Grp. LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013).

This court "grant[s] significant deference to Commerce's own interpretation of [scope] orders." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1094–95 (Fed. Cir. 2002) (citing *Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995)). "This deference is appropriate because the meaning and scope of . . . orders are issues 'particularly within the expertise' and 'special competence' of Commerce." *King Supply Co. v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998)). A party challenging a scope ruling by Commerce under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Id.* (internal quotation marks and citations omitted).

### I. Legal Framework

There is no specific statutory provision governing the interpretation of the scope of antidumping or countervailing orders. However, Commerce's regulations permit an importer to "request a scope ruling as to whether a particular product is covered by an . . . order." *Sango Int'l L.P. v. United States*, 484 F.3d 1371, 1376 (Fed. Cir. 2007) (citing 19 C.F.R. § 351.225(c)(1)). The language of the order is the "cornerstone" of a scope analysis and "a predicate for the interpretive process." *Duferco Steel*, 296 F.3d at 1097.

The regulations require Commerce, when determining the scope of an order, to engage in a two-step process. First, Commerce must consider the scope language con-

tained in the order itself, the descriptions contained in the petition, and how the scope was defined in the investigation and in the determinations issued by Commerce and the ITC. *Duferco Steel*, 296 F.3d at 1097; 19 C.F.R. § 351.225(k)(1). The petition and preliminary determinations of Commerce and the ITC involved in the underlying duty investigations "may provide valuable guidance as to the interpretation of the final order." *Id.* If Commerce concludes the product is, or is not, included within the scope of the order, Commerce issues a final scope ruling. *See Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1071 (Fed. Cir. 2001). If a subsection (k)(1) analysis is not dispositive, then Commerce proceeds to an analysis of the Diversified Products Criteria under subsection (k)(2) of its regulations. These criteria are: (1) physical characteristics, (2) expectations of ultimate purchasers, (3) ultimate use, (4) channels of trade in which the product is sold, and (5) manner of advertising and display. 19 C.F.R. § 351.225(k)(2).

## II. Analysis

### A. The CWC Companies Had Standing

As a threshold matter, Yuanda argues the CWC companies "do not produce aluminum extrusions, but instead produce . . . unitized curtain wall units, made by permanently sealing glass in a frame made from *purchased* aluminum extrusions" and therefore they lacked standing to file the scope ruling request. Appellants' Br. 15; *see also id.* at 23 (The ITC found injury to producers of aluminum extrusions but "did *not* find material injury to *purchasers* of aluminum extrusions that use them to produce different products."). Under 19 C.F.R. § 351.225(c), only an interested party may apply for a scope ruling. In relevant part, the antidumping and countervailing duty statutes define an interested party to include a "manufacturer, producer, or wholesaler in the United States of a domestic like product," 19 U.S.C.

§ 1677(9)(C), as well as "a trade or business association a majority of whose members manufacture, produce, or wholesale a domestic like product in the United States," *id.* § 1677(9)(E).

Relying on certifications of each member that "it produces, manufactures and fabricates aluminum extrusions for the production of curtain wall units and parts of curtain wall systems in the United States," J.A. 975–77, and that curtain wall units are expressly covered by the scope of the orders, Commerce determined each CWC company is a manufacturer, producer, or wholesaler in the United States of a domestic like product. Final Scope Ruling at 2 (citing 19 U.S.C. § 1677(9)(C)). In response to Yuanda's standing arguments, Commerce found "no evidence on the record that calls the accuracy of these certifications into question," discussed the broad scope of the Orders, and noted they encompassed "a myriad of industries." *Id.* at 10.

Parts for curtain walls were included from the beginning of the investigation. *See, e.g.*, *Aluminum Extrusions from the People's Republic of China*, 75 Fed. Reg. 22,109, 22,114 (Dep't of Commerce Apr. 27, 2010) (initiation of antidumping duty investigation) ("[S]ubject aluminum extrusions may be described at the time of importation as parts for final finished products . . . including . . . curtain walls."). In response to Yuanda below, Commerce explicitly held that "curtain walls assembled after importation are within the scope [of the Orders]," J.A. 1230, and since curtain walls are comprised of curtain wall units, the scope ruling included the units. The ITC Final Report also indicates the ITC considered curtain wall units in its initial investigation. *See Certain Aluminum Extrusions from China,* Inv. Nos. 701-TA-475 & 731-TA-1177, USITC Pub. 4229 (May 2011) (Final).

Appellants insist the "record shows that the Commission never collected data or otherwise investigated the

condition of, and the effect of subject imports on, domestic producers of curtain wall units." Appellants' Br. 23 (citing J.A. 1163). Yuanda provides no legal support for its contention that such an investigation is necessary, and, in fact, the purpose of a scope proceeding is to clarify whether a specific product is covered. As the Government points out, "appellants' suggestion that the ITC must find injury as to all domestic producers is akin to requiring *every* producer of aluminum extrusion products expressly listed in the scope, and those covered by an order but not expressly listed, to participate in an investigation." United States' Br. 18. Yuanda's unsupported contention accordingly fails.

Similarly, Yuanda also relies on *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998), to argue "[t]he Orders [c]annot [l]awfully [e]xtend to [i]mports of [c]urtain [w]all [u]nits [w]ithout a [f]inding of [i]njury to the [d]omestic [c]urtain [w]all [u]nit [i]ndustry." Appellants' Br. 22. That case is inapposite. Here, the investigations included aluminum extrusion parts, such as those used for curtain walls, J.A. 1220–34, whereas in *Wheatland*, line pipe was not included in the injury determinations and so the court held the order could not be expanded beyond that injury determination. *See Wheatland Tube Co.*, 161 F.3d at 1369.

If Commerce or the CIT had determined producers of curtain wall units are not "producers, manufacturers, or wholesalers of the domestic like product" it would mean that curtain wall units are not within the scope of the Orders. This finding would be in direct conflict with the Final Scope Ruling, at issue in this case, that curtain wall units *are* within the scope of the Orders. *See* Final Scope Ruling at 10. The CIT thus correctly found the CWC companies "produce and manufacture 'aluminum extrusions for the production of curtain wall units and parts of curtain wall systems,' products that the court finds fall

within the ambit of the Orders." J.A. 18. Accordingly, the Defendants-Appellees had standing.

## B. The Scope Language of the Orders Includes Curtain Wall Units

Scope language is the "cornerstone" of any scope determination. *See Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) (quoting *Duferco Steel*, 296 F.3d at 1097). The scope, in relevant part, of Commerce's antidumping and countervailing duty Orders regarding certain aluminum extrusions from the People's Republic of China recites:

> The merchandise covered by these Orders is *aluminum extrusions which are shapes and forms*, produced by an extrusion process, made from aluminum alloys having metallic elements . . . .

> *Aluminum extrusions are produced and imported in a wide variety of shapes and forms,* including, but not limited to, hollow profiles, other solid profiles, pipes, tubes, bars, and rods. Aluminum extrusions that are drawn subsequent to extrusion (drawn aluminum) are also included in the scope. . . .

> *Subject aluminum extrusions may be described at the time of importation as parts for final finished products* that are assembled after importation, *including,* but not limited to, window frames, door frames, solar panels, *curtain walls*, or furniture. . . .

> The scope also excludes finished merchandise containing aluminum extrusions as parts that are *fully and permanently assembled and completed at the time of entry*, such as finished windows with glass, doors with glass . . . .

Final Scope Ruling 3–4 (emphases added).

Yuanda's primary argument on appeal is that "Commerce [u]nlawfully [e]xpanded the [s]cope of the Orders on [a]luminum [e]xtrusions to [i]nclude [c]urtain [w]all [u]nits." Appellants' Br. 21. Specifically, Yuanda contends both Commerce's and the CIT's decisions "stand on a 'formal fallacy,' *i.e.*, a flaw in the logical structure of the argument which renders the argument invalid." *Id.* Yuanda agrees "[a]luminum extrusions are subject to the Orders" and "may be described as parts for curtain walls." *Id.* at 22. Yuanda disagrees, however, that these propositions lead to the conclusion that its curtain wall units are subject to the Orders. Instead, Yuanda argues, the plain language of the Orders demonstrates curtain wall units are subject to the Orders only "*if aluminum extrusions are imported as parts for curtain walls,*" *id.* at 28, and that "[c]urtain wall units are different from the aluminum extrusions used to make their frame," *id.* at 26; *see also id.* at 28 (explaining Commerce undertook no analysis "to show that unitized curtain wall units 'otherwise meet the definition of' aluminum extrusions").

Commerce's expertise is often required to clarify scope language and determine whether products fall within the language of the order, which is typically written in general terms. *See* 19 C.F.R. § 351.225(a); *see also Duferco Steel*, 296 F.3d at 1096. The Orders here cover "aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys having metallic elements corresponding to [certain] alloy series designations." J.A. 1011. Its definition of subject aluminum extrusions is broad and covers products with a "*wide variety* of shapes and forms," and "with a *variety* of finishes (both coatings and surface treatments), and types of fabrication." *Id.* (emphases added). Curtain wall units, such as Yuanda's, "can be ordered from multiple foreign sources as assembled aluminum framed units, and [may be] sometimes pre-glazed with glass." J.A. 989. They contain aluminum extrusions. That Yuanda's products

are called "curtain wall units," rather than "aluminum extrusions" does not preclude them from the scope since they otherwise meet the physical description of the subject merchandise.

Indeed, curtain wall parts and units are often classified and imported under the Harmonized Tariff Schedule of the United States ("HTSUS") subheadings 7610.90 and 7610.10, which cover "aluminum structures and parts of structures; other." HTSUS 7610.10, 7610.90. Appellant Jangho contends "'[a] product's tariff classification is merely of peripheral interest to suggest the general nature of a good' and is not dispositive of whether a product falls under the scope of an order." Jangho Reply 11 (quoting *Torrington Co. v. United States*, 745 F. Supp. 718, 722 (Ct. Int'l Trade 1990)). Here, neither Commerce nor the CIT found the HTSUS subheadings dispositive; the HTSUS merely bolstered what is already explicitly included in the language of the Orders. *See* J.A. 1230.

Yuanda also disregards the Orders' explicit inclusion of parts for curtain walls. The Orders include (1) "subject aluminum extrusions . . . described at the time of importation as parts for final finished products that are assembled after importation, including . . . curtain walls," (2) "aluminum extrusion components that are attached (*e.g.,* by welding or fasteners) to form subassemblies (*i.e.,* partially assembled merchandise)," and (3) aluminum extrusions that are "identified with reference to their end use." Final Scope Ruling at 4. Each of these three categories applies to curtain wall units.

Yuanda further contends the CIT "acknowledges implicitly that aluminum extrusions and curtain wall units are different products," suggesting the scope does not extend to curtain wall units or parts of curtain walls. Appellants' Br. 26 (citing *Shenyang Yuanda*, 961 F.Supp. 2d at 1298–99). To Yuanda, Commerce "impermissibly *assumed* that because the Orders mention 'parts' for

'curtain walls,' they therefore extend to unitized curtain wall units." *Id.* at 28. As the CIT explained, curtain wall units are "undeniably components that are fastened together to form a completed curtain wall," *Shenyang Yuanda*, 961 F.Supp. 2d at 1298, and "the CWC [companies] sought a ruling on what products were covered by the Orders, not whether specific companies' merchandise could be excluded from them." *Id.* at 1301. Yuanda essentially argues the whole is something different than the sum of its parts. This could be true if essential character changed from what was considered in the investigation. Here, however, as explicitly provided for in the scope language, parts for curtain walls *are* part of the subject matter of the Orders. This court discerns no flaw in Commerce's determination that Yuanda's curtain wall parts are within the plain language of the Orders.

In addition to the plain language of the Orders, Commerce will also consider the descriptions of the merchandise contained in the petition, the initial investigation, and the prior determinations of Commerce and the ITC. *See King Supply*, 674 F.3d at 1345. Those descriptions in the petition initiating the antidumping and countervailing duty orders as well as the ITC investigation also show parts for curtain walls are included within the Orders' scope. The ITC noted "aluminum extrusions serve in a wide variety of applications such as window and door frames and sills, curtain walls, thresholds, gutters, solar panel frames, and vehicle parts" and emphasized the broad range of end uses for the subject aluminum extrusions, including "[b]uilding and [c]onstruction," which specifically included "high-rise *curtain wall*" products. J.A. 1128–30 (emphasis added). The ITC noted "[a]ccording to petitioners, the wide and varied uses of aluminum extrusions are due to their combination of desirable performance characteristics such as high strength, low weight, high corrosion-resistance, and relative workability and/or machineability." J.A. 1128.

Accordingly, the petition and investigation support the CIT's holding.

### C. Yuanda's Products Do Not Fall Within the "Finished Merchandise" Exception

Yuanda argues that "[e]ven if it were possible to read the scope language of the Orders as otherwise including curtain wall units, the [Orders'] explicit exclusion for 'finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry' would remove *unitized* curtain wall units from [their] scope." Appellants' Br. 28. The CIT acknowledged this argument, rejecting Yuanda's contention "the term 'parts for' somehow means something smaller or less manufactured than a curtain wall unit." *Shenyang Yuanda*, 961 F.Supp. 2d at 1298. Ultimately, the CIT determined that "there is nothing in the 'parts for' language that would suggest this kind of restriction, and the court will not add any." *Id.*

Commerce explicitly considered whether Yuanda's merchandise fell into one of the enumerated exclusions from the Orders and found that the parts of curtain walls subject to the scope ruling did not satisfy the "finished merchandise" exclusion. Commerce explained that the CWC companies defined curtain wall as "an aluminum extrusion framed non-weight bearing exterior wall" that is supported by the structure of the building to which it is secured. Final Scope Ruling at 3. Commerce also explained "curtain wall parts fall short of the final finished curtain wall that envelopes [sic] the entire building structure. Certain curtain wall parts are assembled into modules that are designed to be interlocked with other curtain wall parts, like pieces of a puzzle." *Id.*

Commerce determined finished merchandise is a "complete product upon entry," but that units for curtain walls are designed to be attached to other units to eventually form a completed curtain wall. The CIT also de-

termined an individual curtain wall unit "has no consumptive or practical use because multiple units are required to form the wall of a building." *Shenyang Yuanda*, 961 F. Supp. 2d at 1298–99. Yuanda itself concedes that "absolutely no one purchases for consumption a single curtain wall piece or unit." *Id.* at 1298 (internal quotation marks and citation omitted). A single unit does not a curtain wall make, nor is it a finished product. As the CIT correctly explained, "[c]urtain wall units are [] undeniably components that are fastened together to form a completed curtain wall. Thus, they are 'parts for,' and 'subassemblies' for, completed curtain walls." *Id.* A part or subassembly, here a curtain wall unit, cannot be a finished product.

Moreover, although the scope excludes "windows with glass," it does not exclude curtain wall units with glass. J.A. 125; *see also Shenyang Yuanda*, 961 F. Supp. 2d at 1298 ("[I]t is apparent that the Orders separately and intentionally distinguish windows from curtain wall units, and that the 'finished merchandise' exception does not encompass curtain wall units."). Under the doctrines of *expressio unius est exclusio alterius*[1] and *noscitur a sociis*,[2] that finished windows with glass are excluded by

---

[1] Typically used in statutory interpretation, this Latin phrase translates to mean the express mention of one thing excludes all others. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which [is] abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded.") (internal quotation marks and citations omitted).

[2] "The maxim *noscitur a sociis*, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of

name means that walls with glass are necessarily included, leaving aside that curtain walls are also specifically included by name. Accordingly, the CIT correctly determined Yuanda's curtain wall parts are not finished merchandise because it is nonsensical to construe "*parts for . . . curtain walls*" to mean finished merchandise. *Id.* at 1299 (internal quotation marks and citation omitted).

## D. Commerce Properly Declined to Consider the 19 C.F.R. § 351.225(k)(2) Factors

Both the plain language of the Orders and the description of the merchandise in the investigations clearly demonstrate that curtain wall units and other parts of curtain walls are within the scope of the Orders. Accordingly, contrary to Appellants' argument, Commerce did not err by declining to consider the additional factors of 19 C.F.R. § 351.225(k)(2). Had Commerce considered these factors after finding the scope language dispositive, it would have been in conflict with this court's precedent and the regulations. *See Eckstrom Indus., Inc.*, 254 F.3d at 1076 ("Commerce may only look to the factors enumerated in 19 C.F.R. § 351.225(k)(2) if its consideration of the order in light of the underlying petition, investigations, and determinations is not dispositive."); 19 C.F.R. § 351.225(k)(2).

## CONCLUSION

The scope language explicitly includes "parts for . . . curtain walls" and curtain wall units are parts of a finished curtain wall. Therefore, Yuanda's curtain wall units meet the definition of the subject aluminum extrusions. Accordingly, the decision of the CIT is

---

many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961).

**AFFIRMED**